UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
In re:

JOHNS-MANSVILLE CORPORATION, et al.,

                      Debtors.
------------------------------------------------------------X
------------------------------------------------------------X

BEVAN & ASSOCIATES, LPA, INC. et al.,

                      Appellants,

-v-

ERIC BOGDAN and THE BOGDAN LAW FIRM,

                      Appellees.
------------------------------------------------------------X

16 Civ. 7154 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves an appeal from a Bankruptcy Court decision allocating a $20 million attorneys' fee award among counsel for the plaintiffs in a long-running asbestos-related litigation.

Appellants Bevan & Associates, LPA, LLC ("Bevan"), the Law Offices of Bruce Carter ("Carter") and the Madeksho Law Firm PLLC ("Madeksho") (collectively, "Appellants" or "the Appellant Law Firms") appeal from a final order and decision of the United States Bankruptcy Court for the Southern District of New York ("the Decision"). The Decision allocated a $20 million attorneys' fee award, achieved as part of a settlement with an insurance carrier, evenly in four ways among the three Appellant Law Firms (collectively, $15 million) and appellee Eric Bogdan and his Bogdan Law Firm ("Bogdan") ($5 million). The Appellant Law Firms and Bogdan had been among the law firms that represented plaintiffs in asbestos lawsuits against

1

Travelers Indemnity Company, Travelers Casualty and Surety Company, and affiliates (collectively, "Travelers"), insurance companies affiliated with asbestos manufacturer Johns-Manville Corporation ("Manville"). The $20 million amount of the fee award had been set in a court-approved settlement agreement with Travelers, but that agreement was silent as to the allocation of the fee award among plaintiffs' counsel.

The Appellant Law Firms here claim, *inter alia*, that the Bankruptcy Court erred in inferring an agreement among plaintiffs' counsel under which Bogdan and the three Appellants would each receive $5 million of the award. They argue that there was no such agreement and instead that the award is properly divided among them and Bogdan pursuant to the doctrine of *quantum meruit*, under which they argue Bogdan, whom Appellants claim did substantially less work in litigating and settling the lawsuits against Travelers, would stand to receive far less than $5 million. The Appellant Law Firms separately challenge other rulings of the Bankruptcy Court, including its ruling that Bogdan's failure to obtain releases from his clients was not a breach of the settlement agreement. Bogdan defends the rulings below.

For the reasons that follow, the Court holds, with the Appellant Law Firms, that it was error to find an agreement allocating the $20 million fee award evenly among Appellants and Bogdan. The Court accordingly reverses the Decision below.

I.  **Background**[1]

A.  **The Johns-Manville Litigation**

This case arises from a series of long-running asbestos litigations, originally against Manville and, later, against Travelers. The extensive history of the litigation was recounted with

---

[1] The Court's summary of the facts is drawn from the Decision and other aspects of the record.

2

care and clarity by the Bankruptcy Court below. The Court here reviews only the most salient aspects of that history.

On August 26, 1982, Manville filed for bankruptcy, largely as a result of proliferating asbestos-related suits against it. Before and during the bankruptcy proceedings, Manville and its insurers were embroiled in litigation concerning the scope of Manville's insurance coverage. Manville ultimately settled with its insurers for around $770 million. As between Manville and the insurers, the ensuing settlement agreement, approved by the Bankruptcy Court, had these central features: It provided for (1) the channeling to the Manville Trust of all asbestos claims against the settling insurers arising out of their policies, based upon, arising out of, or related to any or all of their insurance policies to the Manville Trust; (2) the release of the settling insurers from any further obligations based upon, arising out of, or related to these policies, and (3) entry of a permanent injunction, specifically prohibiting all future claims for bad faith or insurer misconduct and enjoining all persons from pursuing policy-based claims against the settling insurer group. Decision 4–5, R. 10–11.

On December 22, 1986, this settlement order was formally incorporated into Manville's bankruptcy plan by court order. As a result, the asbestos-related claims against the relevant settling insurers, including Travelers, were enjoined, and "future asbestos claimants," those "who had been exposed to Manville's asbestos prior to . . . [August 1982] but had not yet shown any signs of disease," were required to file their claims against the Manville Trust, created from the settlement with the insurers, and not against the insurers themselves. *Id.* at 6, R. 12 (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988)).

**B.     Direct Action Suits Against Travelers**

Notwithstanding this settlement, lawsuits directly against Travelers by asbestos plaintiffs proliferated. These were brought both under common law and statutory theories. At least some of these claims were brought as part of a national insurance litigation project against Travelers in which Carter and Madeksho prominently participated as counsel. R. 953–57. The common law claims sought to hold Travelers liable for various alleged wrongs. Plaintiffs claimed, *inter alia*, that Travelers had "conspire[ed] with Manville to suppress evidence" and that it and Manville had "engineer[ed] a fraudulent 'no duty to warn' defense." Decision 7.

In early 2002, the direct-action suits against Travelers had reached a "critical mass." *Id.* It is not clear how much discovery specific to the cases against Travelers had been done at that point. For example, Bogdan, who filed his first case against Travelers in 1998, R. 545, 1504–17, took no depositions of any corporate representatives of Travelers. Madeksho appears to have deposed at least one corporate representative of Travelers, R. 750–51, albeit in a case that was dismissed by 1997.

On August 1, 2002, the Bankruptcy Court ordered a mediation in the pending cases against Travelers. Former New York Governor Mario Cuomo served as mediator.

On May 20, 2004, following mediation, a settlement agreement was reached in principle on the common law direct action claims.[2] R. 882–83. On May 21, 2004, that agreement was reduced to writing and, on May 23, 2004, after further negotiations, was amended and re-executed. R. 244. The Appellant Law Firms and Bogdan had participated in the talks as counsel for asbestos claimants and were signatories to the agreement. R. 188–189. The agreement (as amended, "the Agreement") defined "Settlement Counsel" as the three Appellant Law Firms and

---

[2] The mediation also resulted in two other settlement agreements not at issue here: the Hawaii Direct Action Settlement Agreement and the Statutory Direct Action Settlement Agreement. Decision 8, R. 14.

4

Bogdan "as representatives and counsel of Persons listed on Exhibit C." R. 177, 1545. The Agreement established a $70 million "Common Law Direct Action Settlement Fund," separate from the Manville fund, for asbestos plaintiffs. R. 179, 1547. Relevant here, the Agreement allocated a separate $20 million to attorneys' fees. *Id.* However, as discussed below, the Agreement did not specify clearly how, to whom, and in what percentages the $20 million in attorneys' fees were to be distributed.

On June 7, 2004, "Travelers sought entry of an order approving the terms of the Amended Agreement." R. 245. Various interested parties filed objections to the Agreement. *Id.*

On July 1, 2004 and July 13, 2004, Appellant Carter swore out two affidavits in support of the Agreement. R. 2681–89. These affidavits detailed his and Madeksho's roles in "the insurance litigation culminating in the common law settlement." R. 2686–87.

On July 6, 2004, the Bankruptcy Court held an evidentiary hearing on the Agreement. Carter testified in support of the Agreement, and the attorneys' fees in particular. When asked about his role in negotiating the Agreement, Carter said he "was one of a number of attorneys that participated in the negotiation of the mediation context before Governor Cuomo." R. 2819–20. He testified that the entire $20 million fee award was not to go to him alone, but that it "would be allocated to settlement counsel." R. 2825.

On August 17, 2004, the Bankruptcy Court approved the Agreement as "fair, equitable and reasonable," and the $20 million attorney fee award as "fair, equitable, and reasonable in light of the complexity of the litigations and the size of the recoveries." R. 2763.

Appeals of the approval order ensued, with one reaching the Supreme Court. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009). Ultimately, "the Second Circuit affirmed the order compelling Travelers to pay pursuant to the settlement agreement." Decision 11, R. 17.

5

A dispute, however, arose among the Appellant Law Firms and Bogdan as to the proper allocation of the $20 million fee award; Appellants claimed, *inter alia*, that Bogdan had disrupted the settlement and was not entitled to any part of it. On January 9, 2015, Travelers moved to deposit the disputed attorneys' fees into the court registry. Decision 11, R. 17. The Bankruptcy Court, over Madeksho and Carter's objections, granted the motion and directed Travelers to deposit the $20 million fee award into escrow accounts. *Id.*

### C. The Present Dispute Among Settlement Counsel

On February 3, 2015, Bogdan filed this action, asking the Bankruptcy Court to determine the proper allocation of attorneys' fees among it and the three Appellant Law Firms. R. 59–69. On February 25, 2016, Bogdan amended his complaint. R. 87–101.

Between June 13 and 15, 2016, the Bankruptcy Court held an evidentiary trial to resolve the dispute. Initially, Bogdan argued that the $20 million fee award should be distributed in equal thirds among Bogdan, Madeksho, and Carter, asserting that Bevan was not entitled to any part of the Award because he had renounced his share. *See* R. 237, 393. On June 14, 2016, after Bogdan had rested, the Bankruptcy Court ruled that Bogdan had failed to provide evidence that Bevan had waived his share of the $20 million. R. 725–27. That ruling today is uncontested.

Bogdan thereafter pursued "the claim that the attorney fee fund should be distributed equally, on a *pro rata* basis, among the four Settlement Counsel," Decision 13, R. 19, defined in the Agreement as Bogdan, Madeksho, Carter, and Bevan, R. 177, R. 1545. The Appellant Law Firms, for their part, argued that the fees should be distributed according to the doctrine of "quantum meruit," under which, they contended, Bogdan was not entitled to recover any fees. R. 338–39.

On August 26, 2016, the Bankruptcy Court rendered its decision, siding with Bogdan. It held that the fee award should be distributed in "equal, one quarter parts to Bogdan, Madeksho, Carter, and Bevan." Decision 52, R. 58. In so ruling, the Bankruptcy Court found that the Agreement provision providing for the attorneys' fee award was ambiguous as to its allocation, but that "the parties' objective intent was to split the $20 million in attorneys' fees among Settlement Counsel in equal fourths." *Id.* at 37, R. 43. The Bankruptcy Court also found that the Appellant Law Firms had not proven entitlement to *quantum meruit* because (1) they had not shown how it could be determined that clients had accepted the four law firms' services; and (2) there was "no admissible evidence of the value of the work performed" by the four law firms. *Id.* at 37–38, R. 43–44. Rejecting a separate argument of Appellants, the Bankruptcy Court held that Bogdan had not breached his duties under the Agreement so as to disentitle him to any fees.[3]

On September 13, 2016, the Appellant Law Firms appealed to this Court. On January 17, 2017, they filed their opening brief. They made six claims of error. The Bankruptcy Court, they asserted, erred (1) in finding that the four law firms had objectively intended to divide the fees *pro rata*, (2) in failing to apply the doctrine of *quantum meruit*, (3) in allocating 25% of the award to Bogdan even though he did "essentially nothing and actually obstructed the settlement," (4) in barring certain evidence of the parties pre-settlement mediation, (5) in ruling that the fees were intended to compensate the parties only for their work on the mediation and settlement itself as opposed to their earlier work on the litigation, and (6) in finding that Bogdan had not breached his duties under the Agreement to the Appellant Law Firms. Defs' Brief 2–4, Dkt. 8.

---

[3] The Bankruptcy Court also ruled that Bogdan's recovery should not be adjusted downward because of alleged breaches of the New York Rules of Professional Conduct, and that Bogdan was not liable for the attorney's fees of Ronald Barliant, who represented Settlement Counsel during appeals of the Agreement. Decision 47–51. R. 53–57.

7

On March 6, 2017, Bogdan filed a brief in opposition, Dkt. 9, and on March 15, 2017, an amended brief in opposition, Dkt. 10. Bogdan argues, *inter alia*, that: (1) the Bankruptcy Court correctly found that the four law firms had contracted to divide the fee award evenly among them, (2) the Bankruptcy Court correctly declined to apply the doctrine of *quantum meruit* to the fee allocation, (3) even under *quantum meruit*, Bogdan was entitled to the same 25% share of the fee Award, (4) the Bankruptcy Court correctly discounted as irrelevant the Appellant Law Firms' litigation activity outside of their work bringing about the settlement, and that (5) Bogdan had not breached that Agreement.

On March 20, 2017, the Appellant Law Firms filed a reply. Dkt. 11.

## II. Discussion

### A. Standard of Review

This Court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts pursuant to 28 U.S.C. § 158(a). In exercising its appellate review, the Court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree." *In re Big Apple Volkswagen, LLC*, 571 B.R. 43, 48 (S.D.N.Y. 2017). Legal conclusions are reviewed de novo. *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012). Findings of fact are reviewed for clear error. *In re MSR Resort Golf Course LLC*, No. 13 CIV. 2448 KPF, 2014 WL 67364, at *5 (S.D.N.Y. Jan. 7, 2014). "In regards to mixed questions of law and fact, the Court must review findings of fact under the clearly erroneous standard and the conclusions of law *de novo*." *In re MSR Resort Golf Course LLC*, 2014 WL 67364, at *55 (quoting *In re Premier Operations*, 294 B.R. 213, 217 (S.D.N.Y. 2003)); *cf. In re Froman*, 566 B.R. 641, 647 (S.D.N.Y. 2017) ("Mixed questions of fact and law are subject to *de novo* review" (quoting *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 90 (2d Cir. 2003)).

"While the bankruptcy court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden." *In re Lehman Bros. Holdings, Inc.*, 415 B.R. 77, 83 (S.D.N.Y. 2009) (internal quotations omitted). "[A] finding is 'clearly erroneous' when [the reviewing court is] left with the definite and firm conviction that a mistake has been made." *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

### B. The Allocation of Attorneys' Fees Under the Agreement.

As noted above, the Appellant Law Firms first dispute the Bankruptcy Court's holding that the parties to the Settlement Agreement agreed and objectively manifested their intent to distribute the $20 million in legal fees *pro rata* among Bevan, Carter, Madeksho, and Bogdan. To resolve this dispute, the Court applies familiar principles of contract law.

"A settlement agreement is a contract that is interpreted according to general principles of contract law." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005). The applicable law here is New York's. The Agreement contains a choice-of-law provision, which selects New York law, R. 184, 1552, and all parties treat New York law as governing.[4]

"Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties" on all essential terms. *Schurr v. Austin Galleries of Illinois, Inc.*, 719 F.2d 571, 576 (2d Cir. 1983). Although the parties dispute whether the Agreement reflects a meeting of the minds as to the allocation of the $20 million fee award, no party disputes that the Agreement as a whole is valid and enforceable.

---

[4] Further, "the parties have consented to application of New York law by briefing all issues under the law of [N]ew York." *Prince of Peace Enterprises, Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011), adhered to on denial of reconsideration, No. 07 CIV. 00349 RJH FM, 2011 WL 650799 (S.D.N.Y. Mar. 14, 2011).

"[A] written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). Contract language is unambiguous if it has a "definite and precise meaning." *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978). "Contract language is ambiguous," by contrast, "if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002). Whether a provision of a contract is ambiguous is a question of law reviewed *de novo*. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992) (internal citations omitted); *see also Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300, 307 (2d Cir. 1996) ("We review a district court's interpretation of a settlement agreement *de novo*").

A contract with a blank provision, almost by definition, contains an ambiguity. *See, e.g., Boyd v. Haritidis*, 239 A.D.2d 820, 821 (N.Y. App. Div. 1997). "[W]here a blank space in a contract has not been filled in, the contract provision may be rendered inoperative and rejected as surplusage if the parties so intended or the ambiguity may be cleared up in the construction of the contract by supplying the omitted words." *Id.* at 821–22 (internal citations omitted). "In resolving such an ambiguity and determining the parties' intent, extrinsic and/or parol evidence may be examined . . . ." *Id.* at 822 (internal citations omitted); *see also Greenfield*, 780 N.E.2d at 170 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous . . . ."). A trial court's interpretation of an ambiguous provision, when based on extrinsic evidence, is a question of fact subject to clear error review. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51–52 (2d Cir. 2011).

The Agreement here contains such a blank. Paragraph 3(a)(2) states that Travelers owes "Twenty Million ($20,000,000) of attorneys' fees to be paid as follows:" R. 177, 1547. But no allocation follows. The Agreement's ensuing text addresses a different issue entirely, the payment of costs associated with the formation of the Settlement Fund, and it nowhere returns to address to whom the $20 million in attorneys' fees are to be paid. The Agreement is, thus, anything but "definite" and "precise" as to the issue at hand. In recognition of this, the parties, in Bankruptcy Court, stipulated that "[t]he Amended Agreement does not provide terms for the manner in which the Legal Fees are to be allocated." R. 245.

This omission can only be viewed as ambiguous. That is apparent from several features of the Agreement. First, Paragraph 3(a)(2) uses the clause "to be paid *as follows*"—yet nothing follows. Similarly, the visual presentation of this portion of Agreement, in which the colon after "as follows" is succeeded by empty space, connotes a lapse in completing this provision. This case, therefore, is far afield from the ones in which omitted language has been treated as an intentional act by sophisticated parties. In such cases, the clauses read naturally without the "omitted" language, and thus the omitted language was at least plausibly treated as intentional. *See, e.g., In Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 560–61 (N.Y. 2014); *Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 578 (S.D.N.Y. 2015); *In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d Cir. 1976).

The Agreement here introduces further ambiguity in that it does not clearly specify that the $20 million is to be divided solely among the four firms denoted as "Settlement Counsel." On the contrary, Paragraph 21 of the Agreement says that the Settlement Counsel "represent only the clients listed on the Agreement's Exhibit C hereto." It adds:

> "This Settlement Agreement shall not be construed as an undertaking or representation of anyone not identified on Exhibit C. Settlement Counsel agree to

11

list in Exhibit C all existing clients of Settlement Counsel with pending or potential Common Law Direct Action Claims as well as existing clients of the following firms: (i) Law Offices of R. Bryan Nace; (ii) Richardson, Patrick, Westbrook & Brickman, LLC; (iii) Martin & Jones; (iv) The Lanier Law Firm[;] and (v) The Simmons Law Firm LLC, with pending or potential Common Law Direct Action Claims."

R. 189, 1554. On the basis of this language, the Bankruptcy Court therefore found that the Agreement, within its four corners, was ambiguous as to whether Settlement Counsel were even the only attorneys entitled to fees from the $20 million award. *See* Decision 27–28. The Bankruptcy Court's perception of these ambiguities was clearly correct.[5]

To try to resolve this ambiguity, the Bankruptcy Court properly examined extrinsic evidence of the parties' intent. It focused primarily on this evidence: (1) Carter's May 21, 2004 email immediately after the first draft of the Agreement was executed; (2) Carter's July 6, 2004 testimony before the Bankruptcy Court supporting approval of the Agreement; (3) Carter's June 3, 2004 email and his testimony at the 2016 trial regarding fees; and (4) Bogdan's testimony at the 2016 trial.

---

[5] It is textually clear that the four law firms who are party to this dispute (the Appellant Law Firms and Bogdan) are among the intended recipients of fees. The parties to the Agreement are identified: "all Persons identified on Exhibit C, Settlement Counsel, and Travelers," and the Agreement identifies the Settlement Counsel as Bevan, Bogdan, Carter, and Madeksho. These four firms and no others are also mentioned in a one-sentence provision of the Agreement captioned "Attorneys' Fees," which reads: "Travelers agrees not to challenge the individual contingency fee arrangements of any Settlement Counsel who is a signatory to this Settlement Agreement." R. 181, 1549. Only Bevan, Bogdan, Carter and Madeksho signed the Agreement as representatives for the claimants. But Paragraph 21's identification of the other law firms listed above that represent clients listed on Exhibit C raises—but does not answer—the question whether those firms, too, were intended claimants, and if so, whether those law firms were intended to be compensated independent of the Settlement Counsel, or from the fee proceeds allocated to particular Settlement Counsel.

As the Bankruptcy Court correctly recognized, the limited communications of the parties that were contemporaneous or nearly so to that Agreement do not clearly demonstrate an intent as to how to divide the fees among Settlement Counsel. Decision 36, R. 42.

*Carter's May 21, 2004 email*: On May 21, 2004, Carter emailed the other Settlement Counsel and, it appears, representatives from other law firms whose clients (other common law asbestos plaintiffs suing Travelers) were to be party to the agreement.[6] His email summarized the newly executed agreement as follows:

> In a nutshell, Travelers is paying $70 million into a fund and $20 million in fees to Settlement Counsel for creating the fund. We completely revised the Exhibit C. It will now be a listing of all of our cases. We will have to work to create and compile the list. We will need the caption information for every case.

R. 1985. Two elements of this email can be viewed as evidence of an expectation—at least on Carter's part—that only the four Settlement Counsel would share in the $20 million fee award, *i.e.*, that none of it would be allocated to the other common law counsel. First, the email capitalizes "Settlement Counsel," treating it as a proper noun as it is in the Agreement. Second, the email states that the basis for the $20 million payment to counsel is "for creating the fund." The email, however, is informally written, was not adopted by the other parties, and therefore, while suggestive, cannot be taken as conclusive on these points. Significant here, though, Carter's email does not given any indication of how the funds were to be distributed among the four Settlement Counsel.

---

[6] Carter's email was sent to: (1) William Connelly and Karl Novak, who based on their email addresses at @rpbw.com, appear to work at Richardson, Patrick, Westbrook & Brickman, LLC; (2) Spencer Parris, Lisa Smith, and Mike Riley, who, based on their @m-j.com email addresses, appear to work at Martin & Jones; (3) Billy Kohlvurn, Randall Bono and Jeffery Cooper who, based on their @simmonsfirm.com email addresses, appear to work at The Simmons Firm LLC; and (4) Bryan Nace, evidently of the Law Offices of R. Bryan Nace. The one firm listed in the Agreement as among the Other Common Law Counsel who appears not to have been copied is the Lanier Law Firm.

*Carter's July 6, 2004 testimony*: On July 6, 2004, Carter testified before the Bankruptcy Court in favor of approval of the Agreement. In pertinent part, he testified, as noted, that the $20 million in attorneys' fees "would be allocated to settlement counsel." R. 2825. That testimony, too, is evidence of an expectation on his part that these fees would be allocated only to Settlement Counsel. And because Carter's testimony on this point was unrefuted at the hearing, it is fair to infer from this public testimony an expectation among all parties, and the Bankruptcy Court, that the $20 million would be paid only to Settlement Counsel. However, Carter said nothing about the allocation of fees among Settlement Counsel. His testimony does not bespeak an intention by the parties to distribute the fees unevenly. Nor, however, does it suggest that an equal distribution was intended. It is simply silent on the point.

*Carter's June 3, 2004 email*: On June 3, 2004, a month before the hearing regarding approval of the Agreement, Carter sent an email to certain counsel regarding the fee award. His email was sent to Bevan and Madeksho, and to certain Common Law Counsel, but Bogdan was not copied. R, 1029, 1985. Carter's email discussed depositing the $20 million into the settlement fund. It states that "Larry and I have $20 million to split as we discussed," but it does not state what that split as discussed would be. R. 1306. At the 2016 trial, Carter testified that he had permission from all four Settlement Counsel, including Bogdan, to rearrange the Agreement in order to ensure certain allocations for him and Madeksho, and that because all counsel had agreed "that [Bogdan's] compensation would be $500,000," Bogdan was left off the email. R. 1023, 1030–31. Carter admitted, however, that agreement had never been put in writing.

For multiple reasons, Carter's June 3, 2004 email does not reveal any agreement as to the allocation of the $20 million: (1) on its face, it is silent as to any particular allocation; (2) Bogdan

14

was not a party to the email and did nothing in writing to signify assent to it; and (3) there are no written manifestations of assent to Carter's email from any of the other Settlement Counsel. Further, the email states that Carter intended, "once we have it all worked out," to "email Travelers' attorneys and Gov. Cuomo's office to amend the settlement agreement to reflect that we are putting the $20 million award into the fund." R. 1306. That amendment, however, never happened. And as to Carter's testimony in the 2016 trial about the meaning of the June 3, 2004 email, after careful consideration, the Bankruptcy Court rejected that testimony. The Court found that "[t]he inference that Bogdan agreed, at any point, to give $20 million in attorneys' fees to Madeksho and Carter is not supported by the evidence." Decision 35. The Court defers to this well-supported factual determination.

In concluding that the parties to the Agreement tacitly agreed to a *pro rata* allocation of the $20 million fee among the four Settlement Counsel, the Bankruptcy Court relied on Bogdan's testimony at the 2016 trial. Bogdan testified that, based on his work in helping to "bring about the settlement" (including the "filing of [his] cases against Travelers, the work [he] had done to develop documents against Travelers, [and his] work on the mediations"), he believed he would receive a fourth of the $20 million. R. 566. Bogdan, however, by his own admission, did not communicate that belief to the other three Settlement Counsel until several weeks, or even a month or two, after the Agreement had been approved. R. 566, 622.

Bogdan's unexpressed subjective belief as to the meaning of an ambiguous contractual term does not bind the parties to that construction. *See Capital Ventures Int'l v. Verenium Corp.*, No. 09 CIV 4261 GBD, 2011 WL 70227, at *4 (S.D.N.Y. Jan. 4, 2011); *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 302 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201 (2d Cir. 1998). And Bogdan,

15

in fact, expressly testified that the parties, at the time of the contract signing, had *not* reached an agreement as to the allocation of attorneys' fees:

> Q: At the time you executed the settlement agreement, was there an agreement amount you and the other counsel, settlement counsel, as to how the fees would be divided among the four of you?
>
> A: No, there was not.
>
> . . .
>
> Q: At or around the time . . . of the settlement agreement in May 2004, did anyone make an effort to work out the allocation issues relating to the attorney fees?
>
> A: No. Mr. Madeksho made a comment to me one time, but that was all. I did not agree with what he thought I should receive.
>
> Q: And what was that?
>
> A: $500,000.
>
> Q: What was your reaction to that proposal?
>
> A: I didn't accept it.

R. 565–66.

Under these circumstances, it was clear error to hold that the parties objectively intended to split the $20 million fee award evenly among the three Appellant Law Firms and Bogdan at $5 million apiece. There was no evidence to support that finding. The Settlement Agreement is silent as to the allocation of that sum; the extrinsic evidence does not reveal any agreement to any allocation, let alone that allocation; and the parties, according to Bogdan himself, had not agreed on an allocation. The evidence at hand uniformly indicates the absence of any agreement as to how the $5 million fee for counsel was to be allocated. The Court therefore has no choice but to reverse and vacate the decision below and remand to the Bankruptcy Court to resolve the proper allocation.

    C.    ***Quantum Meruit***

The absence of any agreement raises the question: By what measure, after the fact, is the $20 million fee award to be allocated among Settlement Counsel?

The Appellant Law Firms urge the Court to instruct the Bankruptcy Court to apply the doctrine of *quantum meruit* to achieve an equitable allocation. Bogdan, for his part, while defending the Bankruptcy Bourt's finding of an agreement under which he was to receive $5 million, is silent as to whether *quantum meruit* or some other means should be used to allocate fees if no agreement were found. Bogdan instead posits that even under *quantum meruit*, he is entitled to a $5 million share.

"The doctrine of *quantum meruit* allows a service provider to recover the fair and reasonable value of services performed. It is a device used to prevent unjust enrichment of one party at the expense of another in the absence of a valid contract." *Brooks v. Cohen, Jayson & Foster*, P.A., No. 08 CIV 4462 DAB, 2010 WL 3528919, at *3 (S.D.N.Y. Aug. 26, 2010) (internal citations omitted). To state a claim for *quantum meruit* under New York law, the defendants must establish (1) that they performed the relevant services in good faith, (2) that the person to whom the services were rendered accepted them, (3) that the defendants had an expectation of compensation for their work, and (4) the reasonable value of the defendants' services. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). Further, the value of an attorney's services in a *quantum meruit* claim is determined by: (1) the complexity of issues, (2) the nature of the services, (3) the time spent, (4) the amount involved, (5) the professional standing of counsel and (6) the results obtained. *Metrano v. Eisen*, No. 87 CIV. 4186 (JFK), 1993 WL 17331, at *1 (S.D.N.Y. Jan. 21, 1993).

Having found an agreement among the Settlement Counsel, the Bankruptcy Court understandably eschewed allocation pursuant to *quantum meruit*. And quantum meruit is

admittedly an imperfect fit for the instant case. *Quantum meruit* is classically used to determine the fee to which an attorney is entitled from a client: (1) when there was never an agreement on the amount the attorney should charge, (2) when the attorney is fired, or (3) when the attorney has voluntarily withdrawn from the case. *See* 16 Lauren Krone, *Causes of Action First Series: Cause of Action by Attorney to Recover Fees on Quantum Meruit Basis* 85 (Jul. 2017 update); *see also In re Masterwear Corp.*, 233 B.R. 266, 276–77 (Bankr. S.D.N.Y. 1999) ("Because the client has an absolute right to fire his lawyer, the discharged attorney cannot recover damages for breach of contract . . . [but he can] recover in *quantum meruit* for the reasonable value of the completed services."). Here, in contrast, there is no dispute between attorney and client, and there is no dispute as the quantum of the overall fee to be paid to Settlement Counsel. The issue is solely the allocation of that already established collective fee among the four contenders vying for it.

Nevertheless, while the context presented is unusual, the flexible multi-factor inquiry of *quantum meruit* may be the most apt device for the allocation exercise here. As one secondary source has observed: "A *quantum meruit* analysis of attorneys' fees will . . . be appropriate in virtually any case in which the value of legal services is at issue." Krone, *supra*, at 85.

In the end, the Court's judgment is that the appropriate methodology for allocating the $5 million fee here is properly selected, in the first instance, by the able Bankruptcy Judge, who has greatest familiarity with this controversy. The Bankruptcy Court may wish to consider as alternative guidance, for example, the standards—akin but not identical to those used in the *quantum meruit* inquiry—used to gauge attorneys' entitlement from a common class fund, in which "attorneys whose efforts created the fund are entitled to a reasonable fee—set by the court—to be taken from the fund." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir.

2000) (noting that the attorney-fee procedure "prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost"). In determining the relative merits of each of Settlement Counsels' claims to the $20 million, the Bankruptcy Court may wish to consider, too, whether it is proper to consider each firm's contributions to the litigation efforts that preceded the mediation, as such efforts presumably helped enhance plaintiffs' negotiating position in the mediation.

**D.    *Remaining Issues***

In light of this remand, the Court has no occasion to reach the other issues presented by the Appellant Law Firms on this appeal.

## CONCLUSION

For the foregoing reasons, the Court reverses the Bankruptcy Court's decision allocating the $20 million fee equally among Bevan, Bogdan, Carter and Madeksho, and remands this case to the Bankruptcy Court for proceedings consistent with this decision.

The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

*Paul A. Engelmayer*
———————————————
Paul A. Engelmayer
United States District Judge

Dated: September 29, 2017
    New York, New York

19